UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LARRY HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:12-CV-916 |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | JUDGE CAMPBELL |
| NASHVILLE AND DAVIDSON | ) | MAG. JUDGE GRIFFIN |
| COUNTY TENNESSEE, | ) | |
| | ) | JURY DEMAND |
| Defendant. | ) | |

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff's Complaint makes a claim for disability discrimination under the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. §12101 *et seq.* Specifically, plaintiff's Complaint alleges that due to a shoulder injury plaintiff suffered on the job in February 2011,[1] plaintiff was an individual with a disability as defined in the ADAAA, 42 U.S.C. §12102(2) (Complaint [Doc. No. 1, at ¶16), that he was a qualified individual as defined in 42 U.S.C. §12111(8) (Complaint [Doc. No. 1, at ¶17), that defendant's providing plaintiff with light duty work was a reasonable accommodation for plaintiff's disability, (Complaint [Doc. No. 1, at ¶18), and that defendant selected plaintiff for lay off on the basis of plaintiff's disability and/or because of its obligation to provide or continue to provide plaintiff with a reasonable accommodation for his disability (Complaint [Doc. No. 1, at ¶19).

Defendant has filed a Motion for Summary Judgment [Doc. No. 20] on plaintiff's claim. In support of the Motion, defendant makes three arguments (1) that plaintiff cannot establish a *prima facie* case of disability discrimination because he cannot show that he was treated less favorably than any similarly situated employee (Defendant's Brief [Doc. No. 21] at pp. 11-13); (2) that defendant had a legitimate, non-discriminatory reason for laying plaintiff off (Defendant's Brief [Doc. No. 21] at pp. 13-16); and (3) that plaintiff's claim for damages beyond March 7, 2013 should be dismissed (Defendant's Brief [Doc. No. 21] at pp. 17-18).

As will be shown in this Response, there are genuine disputes of material fact that make summary judgment improper on plaintiff's disability discrimination claim and therefore, defendant's Motion seeking dismissal is without merit.[2]

## II.    SUMMARY JUDGMENT PRINCIPLES

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only where there are no genuine issues of material fact and the evidence establishes that the moving party, in this case, defendant, is entitled to judgment as a matter of law.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, in this case, plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  The Court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions …." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed2d 202 (1986).

---

[1]      Paragraph 9 of the Complaint contains a typographical error, stating that plaintiff's injury occurred in February 2012.  It is undisputed that the injury actually occurred on February 22, 2011.  (Defendant's Statement of Material Facts Not in Dispute [Do. No. 22], No. 13].

[2]      Plaintiff does not oppose that part of defendant's Motion related to damages beyond March 7, 2013.

Case 3:12-cv-00916   Document 29   Filed 11/06/13   Page 2 of 25 PageID #: 232

A genuine issue for trial exists if there is sufficient evidence "on which a jury could reasonably find for the plaintiff." *Id.* at 252.

In deciding a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed2d 202 (1986). Thus, the issue is whether the facts established by plaintiff's evidence are sufficient to permit a jury to conclude that defendant unlawfully discriminated or retaliated. *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 147 L.Ed.2d 105, 120, 120 S.Ct. 2097 (2000).

## III.   ARGUMENT

### A.   INTRODUCTION: ADAAA PRINCIPLES

The ADAAA states, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to … discharge …." 42 U.S.C. §12111(a). The term "discriminate" is defined by the ADAAA to include "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. §12111(b)(5)(B). Thus, under the ADAAA, it is unlawful for an employer to discharge an individual because the employer was required to make a reasonable accommodation for that individual.

The term "reasonable accommodation" is defined by the ADAAA to include:

…

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. 42. U.S.C §12111(9).

Furthermore, the ADAAA requires a flexible, interactive process to occur when an employee requests a reasonable accommodation for a disability. The Sixth Circuit in *Kleiber v, Honda of America*, 485 F.3d 862 (6th Cir. 2007) recognized:

> The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. §1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith. *Id.* at 1116; *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999); *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633-34 (7th Cir. 1998); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). When a party obstructs the process or otherwise fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Bultemeyer*, 100 F.3d at 1285 (quoting *Beck*, 75 F.3d at 1135). 485 F.3d at 871.

Regarding who must initiate an accommodation request and what constitutes a request for a reasonable accommodation, according to the EEOC's Interpretive Guidance, it is generally "the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. pt. 1630 App. §1630.9, quoted in *White v. Honda of America Mfg., Inc.*, 191 F.Supp.2d 933, 949 (S.D. Ohio 2002). In order to request a reasonable accommodation, an employee need only "inform the employer of a need for an adjustment due to a medical condition using plain English and need not mention the ADA or use the phrase reasonable accommodation." *Barnett*, 228 F.3d at 1112 (internal quotation marks omitted). Thus, the law does not impose any particular form that an employee's "request" for an accommodation must take, and it does not require that any "talismanic language be used in a request for reasonable

accommodation." *Id.* at 950; *Taylor v. Phoenixville School District*, 184 F.3d 296, 313 (3d Cir. 1999). "What matters under the ADA are not formalisms about the manner of the request, but whether the employee … provides the employer with enough information that, under the circumstances, the employer can be fairly said to have known of both the disability and desire for an accommodation." *Taylor*, 184 F.3d at 313. "The interactive process is triggered by a request for an accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." *Barnett v. US Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000), *rev'd on other grounds in US Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002).

### B. THE APPLICABLE ANALYTICAL FRAMEWORK FOR ESTABLISHING A *PRIMA FACIE* CASE OF UNLAWFUL DISABILITY DISCRIMINATION

To establish a prima facie case of disability discrimination under the ADAAA, plaintiff must produce evidence that: 1) he is disabled; 2) that he is otherwise qualified for his position, with or without reasonable accommodation; 3) that he suffered an adverse employment action; 4) that the defendant knew or had reason to know of the plaintiff's disability; and 5) that the position remained open while the defendant sought other applicants or the disabled individual was replaced. *Whitfield v Tennessee,* 639 F.3d 253, 259 (6th Cir. 2011) (clarifying that the proper test for a prima facie case of discrimination under the ADA is stated in *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173 (6th Cir. 1996)).

Since this case involves a reduction in force, or RIF, situation, however, under Sixth Circuit law, there is a heightened *prima facie* burden that a plaintiff must meet to establish the fifth element of the *prima facie* case. *Geiger v. Tower Automotive,* 579 F.3d 614, 623 (6th Cir. 2009); *Barnes v. Gencorp Inc*, 896 F.2d 1457, 1465 (6th Cir. 1990). "[B]ecause the most common legitimate reason for the discharge of a plaintiff in a [reduction in force] situation is the

work force reduction, the plaintiff must provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Geiger,* 579 F.3d at 624 (internal quotation marks and citations omitted). This additional showing can usually be met by demonstrating that a "comparable non-protected person was treated better." *Williams v. Emco Maier Corp.,* 212 F. Supp. 2d 780, 784 (S.D. Ohio 2002) (modified fifth prong of ADA prima facie showing in RIF case whether plaintiff presented additional evidence to show she was singled out for termination for impermissible reasons), citing *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 350 (6th Cir. 1998) (in ADEA case, "a plaintiff satisfies the fourth prong where he or she demonstrates that a 'comparable non-protected person was treated better.'").[3]

The requirement for making a *prima facie* case is "not onerous" and poses a burden "easily met." *Cicero v. Borg-Warner Automotive, Inc.* 280 F.3d 579, 584 (6th Cir. 2002), citing *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 660 (6th Cir.2000).

In this case, defendant's argument regarding the *prima facie* case is limited solely to the fifth element of plaintiff's *prima facie* case. Defendant does not take the position that plaintiff is unable to establish elements 1-4 of the *prima facie* case; therefore, for purposes of defendant's Motion, it is not disputed that plaintiff was disabled, that he was qualified for his position with or without a reasonable accommodation, that he suffered an adverse employment action, and that defendant knew of plaintiff's disability.

---

[3]     Defendant's Brief cites *Hopkins v. Electronic Data Systems Corp.,* 196 F.3d 655 (6th Cir. 1999) for the proposition that the fifth element of plaintiff's *prima facie* case is that "similarly situated non-protected employees were treated more favorably." (Defendant's Brief at pp. 9-10). *Hopkins* involved a corporate restructuring and elimination of plaintiff's job, but it did not discuss the heightened evidentiary requirement for the fifth element of the *prima facie* case set firth in *Barnes v. Gencorp Inc,* 896 F.2d 1457, 1465 (6th Cir. 1990). In any event, as shown, this "heightened" requirement can be met by the showing required under *Hopkins,* that is, that plaintiff was treated less favorably than similarly situated non-disabled employees.

### C. PLAINTIFF'S EVIDENCE IS SUFFICIENT TO ESTABLISH THE FIFTH ELEMENT OF THE PRIMA FACIE CASE

Contrary to defendant's claims, the record does establish that similarly situated, non-disabled employees were treated more favorably than plaintiff, which is sufficient to establish the fifth element of the *prima facie* case. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d at 350. To determine which employees to compare plaintiff to, in other words, to determine which employees were "similarly situated" or "comparable" to plaintiff, it is necessary to "identify the proper group of employees with which to compare against the Plaintiff[ ]. In other words, in comparison to which group [was] the Plaintiff[ ] purportedly singled out?" *Bender v. Hecht's Department Stores*, 455 F.3d 612, 622 (6th Cir. 2006). While in cases involving a broad workforce reduction affecting many divisions of a company "identifying this group is not always a simple task," (*Id.*), in this case, the determination is straightforward because the evidence shows that the Fairgrounds budget contemplated the elimination of one employee in one job classification, the Maintenance and Repair I job classification. (Townes Depo. at 15-17, Townes Depo. Exh. 1). Also, defendant's Response to plaintiff's EEOC Charge makes the claim that plaintiff "was the only employee in his job classification eligible for layoff, in light of the fact that he was the last one hired." (Harris depo. Exh. 4, at p. 4). Thus, defendant's own statement shows that the group to compare plaintiff with are those employees in his job classification of Maintenance and Repair Worker I. The RIF in question here contemplated not the elimination of discrete positions across different divisions of an employer, but rather the lay off of a single employee within a single job classification. There were five employees in the Maintenance and Repair I job classification: plaintiff, Jerome Streeter, John Stovall, Teresa Barrett, and J.D. Felts. (Harris depo. at 67-69; Harris depo. Exh. 12). Thus, those five employees were all similarly situated because they were all within the job classification from which one person would be laid

7

off.

Of these five, only plaintiff was on work restrictions and in need of the reasonable accommodation of temporary light duty work. (Hunter Declaration, ¶3). And, plaintiff was the only employee selected for layoff. Thus, plaintiff was treated less favorably than the other non-disabled employees in his job classification and the evidence therefore is sufficient to satisfy the fifth element of the *prima facie* case.[4]

Defendant's Brief attempts to use plaintiff's deposition testimony regarding the fact that he, Jerome Streeter, and John Stovall all were made permanent employees on the same date to argue that Teresa Barrett and J.D. Felts should not be included in the group of comparable employees. (Defendant's Brief at pp. 12-13). However, this argument assumes the validity of defendant's asserted non-discriminatory reason for selecting plaintiff for layoff by asserting that Barrett and Felts are not comparable because they became permanent employees before Streeter, Stovall and plaintiff. This is an erroneous argument because the law requires the comparison to include the entire group from which plaintiff was purportedly singled out. *Bender v. Hecht's Department Stores*, 455 F.3d 612, 622 (6th Cir. 2006). Because the layoff was going to eliminate one person in the Maintenance and Repair I job classification, then all five employees in that classification are comparable under *Bender.*[5]

---

[4] In contrast, if non-disabled employees are also terminated in a RIF along with plaintiff, as in *Williams v. Emco Maier Corp.,* 212 F. Supp. 2d 780, 784 (S.D. Ohio 2002), then the plaintiff would be unable to establish this element of the *prima facie* case.

[5] Defendant's Brief relies on plaintiff's testimony to argue that only two of the other Maintenance and Repair Worker I employees should be considered "comparable." (Defendant's Brief at pp. 11-13). But the testimony relied on was not given in response to questions that were premised on the legal definition of "similarly situated" or "comparable" and there is no evidence that plaintiff has any knowledge of the legal definition of who is a "comparable" employee for purposes of analyzing circumstantial evidence of discrimination; therefore, defendant's argument based on plaintiff's testimony alone is without merit. And, while defendant at page 12 of its Brief claims that plaintiff "made it clear" that he was not comparing himself to Barrett and Felts, defendant's claim is not an accurate description of the testimony. In fact, the questions and answers cited do not even include the names of Barrett and Felts. (Hunter depo.at 208-210). In any event, the relevant issue is not who plaintiff compared himself to, it is who defendant compared him to in determining who to lay off.

8

There is, however, additional evidence to support the conclusion that plaintiff was singled out for an impermissible purpose.

First, plaintiff's termination on April 11, 2011 came on the heels of the "weedeater" incident between plaintiff and his supervisor, David Lewis, which occurred on April 6, 2011. Lewis characterized the incident as "insubordination," but the evidence shows it was actually was a request for a reasonable accommodation under the ADAAA that Lewis simply refused to acknowledge or deal with. The incident thus is significant in determining whether plaintiff was singled out for an impermissible reason.

In the incident, plaintiff told Lewis that plaintiff believed he could not operate the weedeater within his doctor's restrictions, and plaintiff requested that Lewis allow him to return to the duties he had been performing in his light duty job assignment. (Hunter depo. at 24-28, 31-33). Specifically, plaintiff asked Lewis if Lewis could "find me something else to do like I've been doing ever since I got injured ...." (Hunter depo. at 33). Lewis reacted with the statement, "I don't know why you can't do it." (Hunter depo. at 33). Lewis's assistant, Shari Cronkhite, then told Lewis that she had placed plaintiff's medical paperwork on Lewis's desk the day before and that "there's certain things he can't do." (Hunter depo. at 32-33, 35). Lewis did not respond to Cronkhite but at that point, "all heck just broke loose" and when plaintiff said he would just return to his job operating the weedeater, Lewis said "That's it, we're going upstairs. I'm tired of your insubordination." (Hunter depo. at 34-38). When he met with Dozier, plaintiff's position was that he physically could not handle the weedeating assignment and that it would harm his arm and that his position in the matter was in keeping with his restrictions. (Dozier depo. at 21). For his part, Lewis clearly disagreed with plaintiff's assessment of his

injury and restrictions. (Dozier depo. at 23). In the meeting, Dozier said, "we're not going to have anybody around here not doing what they were told to do." (Hunter depo. at 44).

Plaintiff's request that Lewis find him something else to do such what he had been doing in his light duty job was "inform[ing] the employer of a need for an adjustment due to a medical condition using plain English," which is a request for a reasonable accommodation even though he did not mention the ADAAA or use the phrase reasonable accommodation. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002); *see also, Burress v. City of Franklin*, 809 F.Supp.2d 795, 813 (M.D. Tenn. 2011) (plaintiff's statement that he planned to return to work but would require a light duty position satisfied his obligation to request a reasonable accommodation). This request triggered defendant's duty to engage in a flexible, interactive process to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Burress*, 809 F.Supp.2d at 812-813; 29 C.F.R. §1630.2(o)(3). Had such a process occurred, then plaintiff's medical paperwork could have been reviewed, the physical requirements of operating a weedeater could have been discussed and compared to the doctor's restrictions, and if necessary, alternative job assignments made, such as plaintiff had been working on since his injury. But that did not happen, and instead, Lewis accused plaintiff of insubordination and plaintiff was suspended from his job until April 11, when he returned and was laid off.[6]

There is thus an extremely close temporal proximity between plaintiff's request for a reasonable accommodation, defendant's refusal to engage in the required interactive process

---

[6] To be clear, plaintiff is not asserting an independent claim for defendant's failure to accommodate him on April 6, 2011. Instead, the evidence regarding the weedeater incident is relevant in evaluating the timing and motive for the selection of plaintiff as the maintenance worker to be laid off.

10

following plaintiff's request, plaintiff's being suspended because of the claimed insubordination stemming from his request for an accommodation, and the adverse employment action of laying plaintiff off on April 11.[7]  While this temporal proximity may not be enough by itself to establish pretext, in the Sixth Circuit, if the adverse action is "very close" to the protected activity, which in this case would be plaintiff's requesting a reasonable accommodation, temporal proximity alone is sufficient to create an inference of causation sufficient to establish a *prima facie*.  *See*, *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (in a pregnancy discrimination case, temporal proximity can support nexus requirement of *prima facie* case, which "should meet the *Barnes* additional evidence requirement.");  *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000);  *DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir. 2004) (twenty one day separation); *Lindsay v. Yates,* 578 F.3d 407, 418-419 (6th Cir. 2009) (two day separation);  *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 563 (6th Cir. 2004) (three month separation).

The timing of plaintiff's layoff on April 11 is suspicious for other reasons.  Howell Townes, the Fairgrounds' Finance Administrator, testified that normally, the layoff would have occurred at the end of the fiscal year, which was June 30, and that the plan was that the layoff would occur then.  (Townes depo. at 5, 16, 25-26, 39-40).  Dozier attempted to explain the timing of the layoff by testifying that a layoff before the end of the fiscal year would result in some savings for that fiscal year, and that through Howell Townes, they had made an effort to calculate how much money would be saved by a layoff on April 11.  (Dozier depo. at 42). However, Townes testified that he did not perform such a calculation.  (Townes depo. at 27-30). In fact, Townes testified that he was unaware of who was selected to be laid off until after the

---

[7]  And, the actual decision to lay plaintiff off had been made between April 6 and April 8, 2011.  According to Lewis, he was informed by Dozier on April 8 that the layoff would be made on Monday, April 11.  (Lewis depo. at 12-13).  Thus, the layoff decision followed the weedeater incident by 2 days at most.

layoff occurred. (Townes depo. at 13). Thus, the evidence is sufficient to support the inference that the layoff decision was accelerated as a result of the weedeater incident involving plaintiff, which is circumstantial evidence supporting a conclusion that plaintiff was singled out for an impermissible purpose.

Moreover, Kenneth Sanders, who was the Assistant Director of the Fairgrounds, testified that the process of determining who would be laid off occurred only **after** plaintiff was suspended on April 6, 2009, which was 5 days before he was laid off. (Sanders depo. at 31-33; Dozier depo. Exh. 2). Thus, there is evidence to support the conclusion that defendant did not decide that plaintiff would be the employee laid off until after plaintiff was suspended on April 6, 2010, which is additional circumstantial evidence that supports the conclusion that plaintiff was singled out for an impermissible purpose.

### D. PLAINTIFF'S EVIDENCE IS SUFFICIENT TO ESTABLISH THAT DEFENDANT'S ASSERTED REASON FOR SELECTING PLAINTIFF FOR LAYOFF IS PRETEXTUAL

#### 1. Introduction

If the plaintiff's evidence presents a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Monette, 90 F.3d at 1185-86*. Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id. at 1186-87*. In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court set out the appropriate analysis of a plaintiff's proof to determine whether that proof creates a jury question on the issue of defendant's unlawful intent to discriminate.[8] The Sixth Circuit has

---

[8] While *Reeves* was a Rule 50 case, the analysis for purposes of whether to grant a Rule 50 motion for judgment as a matter of law, or, as in this case, a Rule 56 motion for summary judgment, is the same. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250-251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

confirmed that, under *Reeves*, "when the elements of a prima facie case have been met, a plaintiff need not show both pretext and discriminatory intent." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 708-709 (6th Cir. 2001). Thus, evidence that defendant's explanation for plaintiff's termination is false or unworthy of credence is sufficient to overcome summary judgment because such evidence is sufficient to permit the trier of fact to infer unlawful discrimination. *Reeves*, 530 U.S. at 146-147, 120 S.Ct. at 2108-2109.

Ultimately, in this case, plaintiff must produce sufficient evidence to demonstrate that "but for" his disability, he would not have been the person selected for layoff. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).[9] Thus, plaintiff must present sufficient evidence to raise an inference that but for his injury and the need for defendant to accommodate his injury, he would not have been selected for layoff by defendant. *Cf. Hudson v. Insteel Indus., Inc.*, 5 Fed. App'x 378, 382 (6th Cir. 2001) (plaintiff must show that age was determining factor in employer's decision -- that adverse employment action would not have occurred but for employer's motive to discriminate on basis of age).

Under Sixth Circuit law, pretext may be established by evidence that the employer's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A. B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). These methods of establishing pretext circumstantially "are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful

---

[9]     In *Lewis*, the Sixth Circuit adopted a "but for" causation standard for disability discrimination claims under the original ADA as explained by the Supreme Court in *Gross v. FBL Financial Services, Inc.* 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (200*9).*

discrimination was the true motivation." *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 304 (7th Cir. 1996). The record here provides ample evidence that the reasons asserted by defendant for plaintiff's termination are false, contradictory, and unworthy of credence and that also raises a "suspicion of mendacity." <u>See</u>, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed, 2d 407 (1993). Accordingly, there is abundant evidence from which a trier of fact may find pretext and conclude that defendant unlawfully discriminated against plaintiff.

> **2.** **In its Motion Papers, Defendant Asserts That Plaintiff Was Selected For Layoff Because He Was The Last Person Hired Among A Group Of Three Employees Who Became Permanent Employees On The Same Date**

The issue involved in the pretext analysis is whether the evidence is sufficient to raise a genuine issue of fact on the question of whether defendant's asserted reason for selecting plaintiff for layoff is pretextual. So the first step is to examine the evidence regarding the reason or reasons asserted by defendant for its selection of plaintiff for layoff.

Defendant asserts in its Brief that "Dozier determined that the fairest thing to do would be to lay off the employee with the least seniority" and that "to that end, he asked HR Director Kristi Harris to give him the name of the last person hired." (Defendant's Brief at p. 15).[10] Defendant goes on to assert that Harris "remembered" that "the last three people for whom she had submitted paperwork to Metro HR to make them 'permanent' were Jerome Streeter, John Stovall, and Larry Hunter." (Id.). Defendant then asserts that Harris "noticed" that these three employees had the same 'permanent' hire date, and therefore she used their "initial probationary

---

[10] The fairgrounds has no layoff policy. (Sander depo. at 10). There is no provision in the Fairgrounds Employee Handbook about layoffs, and there is no written policy establishing seniority as the applicable standard for layoff. (Dozier depo. at 43). There is likewise no written policy or procedure establishing an employee's date of permanent employment as the applicable date to determine seniority. (Dozier depo. at 43-44).

14

hire date as a 'tiebreaker'" and in that way determined that plaintiff was the "least senior of these 3, who were the only employees she considered …." (Id.). Defendant claims that Harris, "in response to Dozier's question as to who was least senior, told him it was Larry Hunter. (Defendant's Brief at p. 16). Defendant asserts that Dozier "relied on" Harris to "calculate seniority" and did not go back and verify Harris's determination. (Defendant's Brief at p. 15).

In other words, defendant lays responsibility for plaintiff's selection at the feet of Kristi Harris, and says that even if she was wrong in her determination, an "incorrect or unwise employment decision[ ] do[es] not equal intentional discrimination." (Defendant's Brief at p. 16, citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). However, the record evidence shows that defendant's explanation is fraught with weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions such that a reasonable factfinder could rationally find them unworthy of credence, which is sufficient to raise an inference of pretext. *See*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed, 2d 407 (1993); *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1008-09 (3rd Cir. 1997) (citation omitted).

### 3. The Evidence Establishes That Defendant's Asserted Reason Is Pretextual

The Fairgrounds' Finance Administrator, Howell Townes, was responsible for submitting the Fairgrounds'' budget proposal for the fiscal year of July 1, 2011 through June 30, 2012 to Metro's Office of Management and Budget ("OMB") in February 2011. (Townes depo. at 14-17). This proposal is contained in a WEBudget document, which was made Exhibit 1 to Townes' deposition. (Townes depo. at 14-15; Townes depo. Exh. 1). Townes testified that the Fairgrounds' plan was to eliminate one of the five jobs in the Maintenance and Repair Worker I

job classification.[11]  (Townes depo. at 15-17; Townes depo. Exh. 1).  Townes also testified that a layoff would normally occur at or around the end of the fiscal year, which would be June 30, and that that was what he was told and was their plan.  (Townes depo. at 26, 39-40). [12]

When plaintiff was laid off on April 11, 2010, he was given a letter or memo from the Executive Director of the Fairgrounds, Buck Dozier, which stated, "one maintenance worker position is being eliminated.  You were the last person hired and are, therefore, the person who is to be laid off, effective April 25, 2011."  (Harris depo. Exh. 11).  Prior to the filing of this lawsuit, in its Response to Request for Information submitted to the EEOC following plaintiff's EEOC Charge, defendant stated, "Mr. Hunter was the only employee **in his job classification** eligible for layoff, in light of the fact that he was the last one hired."  (Harris depo. Exh. 4, at 4) (emphasis added).  Defendant's EEOC Position Statement, which was submitted to the EEOC along with its Response to Request for Information, actually takes the position that the statement in plaintiff's EEOC Charge that he was hired on June 26, 2009  "is incorrect" and states that plaintiff "was hired by the employer on March 25, 2009."  (Harris depo. Exh. 4, Position Statement at p. 1).  While defendant now claims that June 26, 2009 is the initial and operative date in its decision-making process, when defendant was first called upon to explain the selection of plaintiff for layoff, it made absolutely no mention of the permanent status date having any relevance at all, and to the contrary insisted that it was incorrect to call it plaintiff's date of hire.

There were five employees in the Maintenance and Repair Worker I job classification,

---

[11]     The Maintenance and Repair Worker I job classification was identified as Class 02799.  (Townes depo. at 17; Townes depo. Exh. 1).
[12]     As stated above, defendant tries to explain the timing of plaintiff's layoff as a cost-saving measure, based on Dozier's testimony that they made an effort to calculate how much money would be saved by a layoff in April. (Defendant's Brief at p. 7). However, Dozier testified that Howell Townes would have calculated such potential savings, (Dozier depo. at 42), but Townes testified that he did **not** perform this calculation.  (Townes depo. at 27-30).  This is a contradiction that casts doubt on defendant's proffered explanation of the timing of plaintiff's layoff.

Number 02799: John Stovall, Larry Hunter, Jerome Streeter, Job Felts, and Teresa Barrett. (Harris depo. at 67-69; Harris depo. Exh. 12). As shown by Exhibit 12 to Harris's deposition, and as Harris acknowledged, both Teresa Barrett and Jon Felts were hired after plaintiff was hired. (Harris depo. at 69; Harris depo. Exh. 12). During the EEOC investigation, defendant was asked to submit a list of Fairgrounds employees and include their dates of hire, and Harris was tasked with preparing that list. (Harris depo. at 42-45; Harris depo. Exh. 5). Harris prepared a list with the employees' dates of hire on it and submitted that list to the EEOC. (Id.) The list prepared by Harris has a column designated "DOH" for "date of hire." (Harris depo. at 62-63). According to this list, both Teresa Barrett and Jon Felts were hired after plaintiff. (Harris depo. at 63; Harris depo. Exh. 7). Thus, defendant's own statements show that plaintiff was not the last person hired in his job classification.

Harris attempted to explain her actions by asserting that the Fairgrounds "go[es] by the permanent date" and the dates of hire in her list are the "probationary date[s]." (Harris depo. at 63-64). Her reason for not listing the permanent dates on Exhibit 7 was this circular response:

> A:     The reason I did that is because when the EEOC asked me for this – or Jon[13] asked me for this, at that point, Mr. Hunter had already been laid off, and I had previously gone by the permanent date, but since it – since the probationary date had become the important date, I didn't put the – you know, I went by the probationary date. …
>
> Q.     Well, when you say we go by the permanent date, who is we?
>
> A.     Well, just usually in HR, you know, the permanent date is usually what we go by.
>
> Q.     Usually –
>
> A.     What I go by.
>
> Q.     For what purpose?
>
> A.     Because that's their permanent date. (Harris depo. at 64).

When asked again to explain her statement that she was supposed to use the permanent hire date, Harris was unable to provide a single specific example of when she had used an employee's "permanent" date as opposed to the original date of hire. She testified:

> A: Well, that's just what I always go by, you know, as an HR person. That's just what I usually go by, the permanent date, unless there's a reason to go by the probationary date.…
>
> Q. Well, I mean, how do you decide? Do you flip a coin? Do you go to a policy manual?
>
> A. No. I usually go by the permanent date, but – and of course, in this case, there were three people that had the same permanent date, so I thought the fairest thing to do would be to go down to the probationary date.
>
> Q. Give me some examples where you've always gone by the permanent date.
>
> A. I don't know. I can't think of anything right now.
>
> Q. Well, you said you always do it, so give me some examples of that.
>
> A. Well, I don't know. I'll try to think of something, but it doesn't come up that often, but it does come up sometimes.
>
> Q. Well, give me one example when you've done that.
>
> A. I don't know. Can I think about it a minute? I'll think of something though, because, you know, it doesn't come up a lot, but it does come up sometimes when we have to know when their permanent dates are. (Harris depo. at 76-77).

Harris went on to testify that it was her practice to consider the date of hire to be the date of permanent employment, and that whenever she has a form to fill out that asks for the date of hire, she uses the permanent date "unless there's a reason to go to another -- ….". (Harris depo. at 79). However, Harris testified that even though she did not know the reason that the EEOC was asking for a list of employees to include their dates of hire, which means she would not have been aware of any reason to use a date other than the permanent date according to what she

---

13      "Jon" is Jonathan Michael, Assistant Metropolitan Attorney for defendant. (Harris depo. at 42-43; Harris depo. Exh. 5).

testified to was her practice, in the list she prepared for the EEOC, she listed the employees' dates of hire as their original dates of hire, not their permanent hire dates. (Harris depo. at 80-88). And, Harris testified that in manually preparing the chart for the EEOC, she got the information about the employees' dates of hire from the EBS (Electronic Billing System) forms in their files, which she gets from Metro HR downtown. (Harris depo. at 26-29, 39-43). While EBS forms are generated as different events occur in the tenure of an employee (Harris depo. at 48-49), none of the 70 different fields of information on an EBS form are to record an employee's permanent status date. (Harris depo. at 65; Harris depo. Exh. 9; Sinar depo. at 18-23; Sinar depo. Exh. 1). David Sinar, who is an HR Analyst III for defendant explained that the permanent status date is not recorded on the EBS data fields because there are no benefits based on that date. (Sinar depo. at 23).

After this lawsuit was filed, however, Harris was asked to manually prepare another chart that included the employees' original dates of hire as well as their permanent status dates. (Harris depo. at 93-94; Harris depo. Exh. 14). This chart was prepared on October 10, 2012. (Harris depo. at 93). This date was two days before defendant's Answer to the Complaint was filed. (Doc. No. 6). Thus, as soon as litigation commenced and the validity of defendant's asserted reason for selecting plaintiff for layoff was challenged, defendant for the first time revised its original chart to have it include the permanent hire date.

There are other inconsistencies in Harris's explanation. She first testified that in the process of determining that plaintiff was the last hired, she only looked in the personnel files of Streeter, Stovall, and plaintiff because she "remembered" that they were the last three hired. (Harris depo. at pp. 61-62). However, she later testified that she looked in the personnel files of Teresa Barrett and Jon Felts in addition to Streeter, Stovall, and plaintiff. (Harris depo. at 71-

72).  She then testified that she did not look in Barrett's and Felts' files.  (Harris depo. at 73).

Harris testified that she looked at leave or vacation balance records she kept "to see which files

to pull."  (Harris depo. at 72-73).  But Harris conceded that an employee's leave or vacation

balance is determined by the continuous service date, or original date of hire, not the date of

permanent employment.  (Harris depo. at 73-75).  And, according to the leave balance records,

Teresa Barrett would be shown to be the last person hired.  (Harris depo. at 74).  Harris testified

that Dozier asked her who the last person hired was, and she conceded that she looked at the

vacation balance records to confirm who the last person hired was, and that according to those

records, Barrett was the last hired.   (Harris depo. at 74-75).   But according to Harris's

explanation, seeing that Barrett was the last hired "joggled [her] memory" about Barrett and

Felts "going permanent sooner."  (Harris depo. at 75).   While Harris testified that she kept the

permanent date on the leave balance record (Harris depo. at 73), if that were true, she would have

no reason to look further than the leave balance records to determine permanent hire dates, but

she testified that she used the leave balance records "to determine which files to pull."  (Harris

depo. at 72).

Harris' explanation that she only looked in the personnel files of Streeter, Stovall, and

plaintiff because she "remembered" that they were the last three hired (Harris depo. at pp. 61-62)

is contradicted by Ken Sanders' testimony.  Contrary to defendant's assertion that only Harris

was involved in determining who the last person hired was (Defendant's Brief at pp. 15-16),

Sanders, who at the time was the Assistant Director for the Fairgrounds (Sanders depo. at 5),

testified that he too was involved in the process of trying to determine who the last person hired

was.  (Sanders depo. at 10, 15).  And, contrary to Harris' explanation that she focused on Stovall,

Streeter and plaintiff because they were the last maintenance workers to gain permanent

employment status, Sanders testified that those three were the only maintenance workers considered because they were "looking at the day shift, particular duties with that shift … because that would be the shift that they were able, they thought, to reassign some duties and do without one person." (Sanders depo. at 12). Sanders testified that consideration of who to lay off was limited to the three day shift employees, and that Dozier and plaintiff's supervisor, David Lewis, made that decision. (Sanders depo. at 18, 22-23).[14]

Furthermore, regarding the use of an employee's permanent date, which is the date when an employee's probationary period ends, Harris testified that Ken Sanders is who told her about that practice. (Harris depo. at 78). Sanders was hired on July 28, 2008, and he testified that he learned of the "custom" of using the permanent status date from Howell Townes. (Sanders depo. at 5-7, 24). However, Townes testified that regarding employees hired in 2008, 2009, or 2010, he did not even know if Fairgrounds employees even served a probationary period. (Townes depo. at 43). Even more importantly, Sanders acknowledged that the permanent status date is **not** used to calculate vacations, benefits, **or seniority**. (Sanders depo. at 24-25). Thus, while Harris claims that Sanders told her of the "custom" of using the permanent status date, Sanders himself conceded that the permanent hire date is **not** used to determine an employee's seniority. And, regarding the significance or purpose of the permanent hire date, Sanders could only provide the circular explanation that it is when an employee is designated a permanent employee. (Sanders depo. at 25). Harris as well conceded that an employee's benefits are calculated based on the continuous service date, which is the original hire date. (Harris depo. at

---

[14]     Defendant does not now assert that the reason for plaintiff's selection was that the only group eligible for layoff was the group of day shift maintenance workers. In fact, the evidence shows that the job description for day shift maintenance workers is the same as for the night shift or weekend shift workers. (Lewis depo. at 17-18). Also, both Streeter and plaintiff had previously been assigned to the nights shift, and Barrett, the nightshift worker, had at one point swapped shifts with another dayshift worker because of childcare issues. (Lewis depo. at 14, 18-19).

51).

Moreover, even though defendant now claims that plaintiff was selected because of seniority, Dozier told Howell Townes that plaintiff had been picked to be laid off as opposed to the other four employees in the job classification because "he was lazy, he didn't do a lot of work." (Townes depo. at 23-24). This explanation is dramatically different from the other explanations given by defendant for its actions, and is evidence that defendant's asserted reason did not actually motivate its decision to select plaintiff for layoff. *Dews v. A. B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Thus, there is evidence that the reason now proffered by defendant has no basis in fact because it is not the same as a reason previously articulated by Dozier. *See, EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) (summary judgment reversed; employer offered different justifications at different times for failure to hire plaintiff).

Also, the statement "he didn't do a lot of work" can be reasonably viewed as a reference to the light duty work that plaintiff had been assigned while he recovered from his shoulder injury. There was evidence that Lewis was "frustrated" because he believed that plaintiff was "manipulating" his restrictions by getting them changed by his physician to get out of doing work. (Lewis depo. at 26-33). Lewis shared his frustrations with Dozier. (Dozier depo. at 18). But Lewis could not explain how plaintiff might have been able to "manipulate" his restrictions, which were assigned by his physician, and he testified that he did not know how the restrictions kept changing, but he admitted that he was frustrated and "aggravated" by the changing restrictions because Lewis had to find something for plaintiff to do within the restrictions. (Lewis depo. at 26-33). Lewis even claimed that the physician's restriction of "no lifting over 10 pounds" was not a complete restriction of lifting 10 pounds from any height and was limited to a

restriction of lifting 10 pounds beginning with the arm straight out. (Lewis depo. at 28-31; Lewis depo. Exh. 1).

Lewis had no basis to question plaintiff's veracity about his condition, however. (Lewis depo. at 34). Lewis made no record of any prior incidents involving plaintiff's restrictions of his attitude or his work ethic. (Lewis depo. at 35). Plaintiff's Declaration establishes that he did not in any way attempt to have his restrictions changed based on job assignments. (Hunter Declaration at ¶8). In fact, the record shows that the restrictions in effect when plaintiff was laid off were actually less limiting than previous restrictions.[15]

Moreover, the suspension letter from Dozier dated April 6, 2011 refers to "issues" that Lewis had with plaintiff's "handling of assigned duties." (Dozier depo. Exh. 1). Given that plaintiff was on temporary light duty as he recovered from his shoulder injury and evidence of Lewis' frustration and aggravation regarding plaintiff's physician-imposed restrictions on plaintiff's activities, the suspension letter's reference to "handling of assigned duties" can be seen by a reasonable juror as evidence that Dozier and Lewis viewed the need to accommodate plaintiff's disability in a negative light.

The applicable summary judgment standards require plaintiff's evidence to be believed and all justifiable inferences drawn in plaintiff's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed2d 202 (1986). The evidence, evaluated under applicable summary judgment standards, shows that Lewis was frustrated and aggravated by the need to accommodate plaintiff's restrictions, shared his frustrations with Dozier, and that together they

---

[15] Plaintiff's restrictions following his March 22, 2011 physician visit were no lifting over 10 pounds and no pushing and/or pulling over 20 pounds of force, and no reaching above left shoulder. (Hunter Declaration, Exh. 4). Plaintiff's previous restrictions were no lifting over 5 pounds and no pushing and/or pulling over 10 pounds of force and no reaching above shoulders. (Hunter Declaration at ¶6, Exh. 3).

were displeased with the need to accommodate plaintiff's disability. Given the evidence from Sanders that the process of determining who would be selected for layoff did not begin until plaintiff was suspended for "issues" that included his "handling of assigned duties" when he had asked for a reassignment of work duties, the evidence that the layoff was accelerated to occur in April rather than near the end of the fiscal year, the evidence that plaintiff was actually not the last person hired in his job classification, given the lack of any established policies or procedures about layoffs, and given the shifting and circular explanations offered by those involved, a reasonable juror could conclude that plaintiff was targeted for layoff because of his disability and the need to continue to accommodate his disability, and that defendant simply came up with the "last person hired" rationale as an excuse for plaintiff's selection, and did so without undertaking to confirm that he was actually the last person hired in his job classification. Then, when the validity of defendant's explanation was called into question in this litigation, defendant modified its position to claim that the "last person hired" actually meant the last person to achieve permanent status with Metro, and that because of a "tie" between Streeter, Stovall, and plaintiff, the "tiebreaker" of original hire date was used.

The evidence taken as a whole raises a significant doubt about the veracity of defendant's proffered explanation and is sufficient to create an inference that defendant's asserted justification is not genuine, and is instead "hypothesized or invented post hoc in response to litigation." *See, United States v. Virginia,* 518 U.S. 515, at 533, 116 S.Ct. 2264, at 2275, 135 L.Ed.2d 735 (1996).

## IV.  CONCLUSION

The record establishes genuine issues of material fact that a jury will need to resolve on the elements of plaintiff's claims that are the subject of defendant's Motion.  For these reasons, plaintiff asks the Court to deny defendant's Motion for Summary Judgment to the extent it seeks dismissal of plaintiff's claims under the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. §12101 *et seq.*  As stated above, plaintiff does not oppose defendant's Motion regarding the limitation on recovery of back pay damages.

Respectfully submitted,

Wade B. Cowan (#9403)
Suite 225, 150 Second Avenue North
Nashville, Tennessee 37201
(615) 256-8125
wcowan@dhhrplc.com
Attorney for plaintiff

### CERTIFICATE OF SERVICE

I certify that on November 6, 2013, a copy of this document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

Keli J. Oliver
Derrick C. Smith
Assistant Metropolitan Attorneys
108 Metro Courthouse
P.O. Box 196300
Nashville, TN 37219
Attorneys for Defendant

Wade B. Cowan