UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LARRY HUNTER,                        )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        CIVIL ACTION NO. 3:12-CV-916
                                     )
METROPOLITAN GOVERNMENT OF           )        JUDGE CAMPBELL
NASHVILLE AND DAVIDSON               )        MAG. JUDGE GRIFFIN
COUNTY TENNESSEE,                    )
                                     )        JURY DEMAND
            Defendant.               )


**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT AND STATEMENT OF ADDITIONAL
MATERIAL FACTS IN DISPUTE**


1.      The   Tennessee   State   Fairgrounds/Nashville   Expo   Center
("Fairgrounds") initially hired Larry Hunter ("Hunter") as a maintenance and
repair worker on March 25, 2009.  Deposition of Larry Hunter ("Hunter Depo."),
excerpts attached to Motion as Exhibit A, at 210.

        **RESPONSE:        Undisputed.**




2.      David Lewis, Hunter's supervisor, told Hunter when he was hired that
Hunter had 90 days to prove himself.  Hunter Depo. at 11.

        **RESPONSE:        Undisputed.**

3. Lewis considered Hunter to be a "probationary" employee during that 90 day period. Deposition of David Lewis ("Lewis Depo."), excerpts attached to Motion as Exhibit B, at 16; Declaration of David Lewis ("Lewis Dec."), filed contemporaneously herewith, at ¶ 3.

**RESPONSE:**     **Undisputed for purposes of pending motion only.**

4. The practice at the Fairgrounds was that an employee was considered "probationary" until the employee exhibited to his supervisor that he could perform the job duties expected of him. Lewis Depo. at 15-16; Lewis Dec. at ¶ 3.

**RESPONSE:**     **Undisputed.**

5. Upon completion of this probationary period, Fairgrounds HR Coordinator Kristi Harris would submit paperwork called an EBS to the main HR Department for the Metropolitan Government reflecting that the employee's status had changed from "probationary" to "permanent." Declaration of Kristi Harris ("Harris Dec,"), filed contemporaneously herewith, at ¶ 4.

**RESPONSE:**     **Undisputed.**

6. The Fairgrounds is a non-civil service department within the Metropolitan Government. Harris Dec. at ¶ 6.

**RESPONSE:**     **Undisputed.**

7.     Metro HR encourages non-civil service departments like the Fairgrounds to employ sound employment policies and practices, but the Fairgrounds do not have to defer to Metro HR policies since they do not employ civil service employees.  Deposition of Metro HR Liaison David Sinor ("Sinor Depo."), at 7-8, 40, relevant excerpts attached to Motion as Exhibit D.

    **RESPONSE:**     **Undisputed.**


8.     In June 2009, Larry Hunter went downtown to Metro HR, along with fellow maintenance workers John Stovall and Jerome Streeter.  Hunter Depo. at 124-125.

    **RESPONSE:**     **Undisputed.**


9.     Hunter testified that it was his understanding that this June 2009 date was when his benefits started and that he believed that this June 2009 date was "our actual official hiring date."  Hunter Depo. at 124-125.

    **RESPONSE:     Undisputed for purposes of pending motion that this was plaintiff's testimony.**

    **However, the significance of the June 26, 2009 date for purposes of evaluating defendant's liability is disputed to the extent that defendant claims that plaintiff's testimony forecloses any dispute regarding the "date of hire" for layoff selection purposes, or whether defendant actually used a**

date of hire standard to select plaintiff for layoff. As shown in plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, the circumstantial evidence creates an inference that plaintiff was targeted for layoff for an impermissible reason, and that defendant's proffered reason for selecting plaintiff for layoff is pretextual. *See*, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at pp. 7-24. Specifically regarding plaintiff's date of hire, Defendant's EEOC Position Statement, which was submitted to the EEOC along with its Response to Request for Information, takes the position that the statement in plaintiff's EEOC Charge that he was hired on June 26, 2009 "is incorrect" and states that plaintiff "was hired by the employer on March 25, 2009." (Harris depo. Exh. 4).

10.    Budgets for the Fairgrounds generally were prepared in January for submission to the Metro Office of Management and Budget ("OMB") in February. Deposition of Howell Townes ("Townes Depo."), relevant excerpts attached to Motion as Exhibit G, at 7.

   **RESPONSE:       Undisputed.**

11.    The Fairgrounds proposed budget for fiscal year 2011-2012 was submitted to OMB on February 22, 2011. Townes Depo. at 14-16.

   **RESPONSE:       Undisputed.**

4

12.     That budget showed the elimination of one maintenance and repair worker.  Townes Depo. at 17-18.

**RESPONSE:**          **Undisputed.**


13.     Larry Hunter's date of injury was February 22, 2011.  Hunter Depo. at 143-44, 190.

**RESPONSE:**          **Undisputed.**


14.     Fairgrounds Director Buck Dozier informed the members of the Fair Board at a meeting in December 2010 that he anticipated staff reductions in 2011 due to budgetary concerns.   Declaration of Buck Dozier, ("Dozier Dec."), filed contemporaneously herewith, at ¶ 4.

**RESPONSE:**          **Undisputed.**


15.     Director Dozier decided that the position to be cut was to come from maintenance because that was the largest department within the Fairgrounds and the most able to absorb the loss of a position without adversely affecting Fairgrounds operations.   Dozier Dec. at ¶ 6.

**RESPONSE:**          **Undisputed.**


16.     Once the decision was made that a maintenance worker was to be laid

off, Director Dozier determined that he would lay off the least senior maintenance employee because that seemed to him the fairest thing to do. Dozier Dec. at ¶ 7.

RESPONSE: Disputed. As shown in plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, the circumstantial evidence creates an inference that plaintiff was targeted for layoff for an impermissible reason, and that defendant's proffered reason for selecting plaintiff for layoff is pretextual. *See*, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at pp. 7-24, which is incorporated herein by reference and includes specific citations to the record evidence.

The timing of the layoff creates an inference that plaintiff was targeted for an impermissible reason. Plaintiff's termination on April 11, 2011 came on the heels of the "weedeater" incident between plaintiff and his supervisor, David Lewis, which occurred on April 6, 2011. Lewis characterized the incident as "insubordination," but the evidence shows it was actually was a request for a reasonable accommodation under the ADAAA that Lewis simply refused to acknowledge or deal with. The incident thus is significant in determining whether plaintiff was singled out for an impermissible reason. *See*, Response in Opposition to Defendant's Motion for Summary Judgment, at pp. 9-11. Kenneth Sanders, who was the Assistant Director of the Fairgrounds, testified that the process of determining who would be laid off occurred only after

6

plaintiff was suspended on April 6, 2009, which was 5 days before he was laid off. (Sanders depo. at 31-33; Dozier depo. Exh. 2). Thus, there is evidence to support the conclusion that defendant did not decide that plaintiff would be the employee laid off until after plaintiff was suspended on April 6, 2010, which is additional circumstantial evidence that supports the conclusion that plaintiff was singled out for an impermissible purpose.

Specifically with respect to Dozier's determination, Howell Townes testified that Dozier told him that plaintiff had been picked to be laid off as opposed to the other four employees in the job classification because "he was lazy, he didn't do a lot of work." (Townes depo. at 23-24). This testimony supports a conclusion that seniority was not the selection factor used by Dozier in selecting plaintiff for layoff.

See also, Responses to Nos. 18 and 22.

17. Dozier asked Fairgrounds Human Resources Coordinator, Kristi Harris, to determine who was least senior. Dozier Dec. at ¶ 8; Harris Dec. at ¶ 7.

RESPONSE: Disputed. See Response to No. 16.

As shown in plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, the circumstantial evidence creates an inference that plaintiff was targeted for layoff for an impermissible reason, and that defendant's proffered reason for selecting plaintiff for layoff is pretextual. *See*, Plaintiff's Response in Opposition to Defendant's Motion for Summary

7

Judgment at pp. 7-24, which includes specific citations to the record evidence supporting the inference that plaintiff was targeted for layoff for an impermissible reason. Specifically with respect to Dozier's determination, Howell Townes testified that Dozier told him that plaintiff had been picked to be laid off as opposed to the other four employees in the job classification because "he was lazy, he didn't do a lot of work." (Townes depo. at 23-24). This testimony supports a conclusion that seniority was not the selection factor used by Dozier in selecting plaintiff for layoff.

18.    Ms. Harris, using the "permanent" hire date, determined that Hunter, Stovall, and Streeter were "tied" for least senior.    Harris Dec. at ¶ 8.

RESPONSE:    Disputed.    Kenneth Sanders testified that the permanent status date is not used to calculate seniority. (Sanders depo. at 24-25).

As shown in plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, the circumstantial evidence creates an inference that plaintiff was targeted for layoff for an impermissible reason, and that defendant's proffered reason for selecting plaintiff for layoff is pretextual. *See*, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at pp. 7-24. Specifically with respect to Dozier's determination, Howell Townes testified that Dozier told him that plaintiff had been

picked to be laid off as opposed to the other four employees in the job classification because "he was lazy, he didn't do a lot of work." (Townes depo. at 23-24). This testimony supports a conclusion that seniority was not the selection factor used by Dozier in selecting plaintiff for layoff.

Prior to the filing of this lawsuit, in its Response to Request for Information submitted to the EEOC following plaintiff's EEOC Charge, defendant stated, "Mr. Hunter was the only employee in his job classification eligible for layoff, in light of the fact that he was the last one hired." (Harris depo. Exh. 4, at 4). Defendant's EEOC Position Statement, which was submitted to the EEOC along with its Response to Request for Information, actually takes the position that the statement in plaintiff's EEOC Charge that he was hired on June 26, 2009 "is incorrect" and states that plaintiff "was hired by the employer on March 25, 2009." (Harris depo. Exh. 4, Position Statement at p. 1). While defendant now claims that June 26, 2009 is the initial and operative date in its decision-making process, when defendant was first called upon to explain the selection of plaintiff for layoff, it made absolutely no mention of the permanent status date having any relevance at all, and to the contrary insisted that it was incorrect to call it plaintiff's date of hire.

There were five employees in the Maintenance and Repair Worker I job classification, Number 02799: John Stovall, Larry Hunter, Jerome Streeter, Job Felts, and Teresa Barrett. (Harris depo. at 67-69; Harris

depo. Exh. 12). As shown by Exhibit 12 to Harris's deposition, and as Harris acknowledged, both Teresa Barrett and Jon Felts were hired after plaintiff was hired. (Harris depo. at 69; Harris depo. Exh. 12). During the EEOC investigation, defendant was asked to submit a list of Fairgrounds employees and include their dates of hire, and Harris was tasked with preparing that list. (Harris depo. at 42-45; Harris depo. Exh. 5). Harris prepared a list with the employees' dates of hire on it and submitted that list to the EEOC. (Id.) The list prepared by Harris has a column designated "DOH" for "date of hire." (Harris depo. at 62-63). According to this list, both Teresa Barrett and Jon Felts were hired after plaintiff. (Harris depo. at 63; Harris depo. Exh. 7). Thus, defendant's own statements show that plaintiff was not the last person hired in his job classification.

Harris attempted to explain her actions by asserting that the Fairgrounds "go[es] by the permanent date" and the dates of hire in her list are the "probationary date[s]." (Harris depo. at 63-64). Her reason for not listing the permanent dates on Exhibit 7 was this circular response:

> A:    The reason I did that is because when the EEOC asked me for this – or Jon asked me for this, at that point, Mr. Hunter had already been laid off, and I had previously gone by the permanent date, but since it – since the probationary date had become the important date, I didn't put the – you know, I went by the probationary date. ...
> Q:    Well, when you say we go by the permanent date, who is we?

10

A.    Well, just usually in HR, you know, the permanent date is usually what we go by.

Q.    Usually –

A.    What I go by.

Q.    For what purpose?

A.    Because that's their permanent date.  (Harris depo. at 64).

When asked again to explain her statement that she was supposed to use the permanent hire date, Harris was unable to provide a single specific example of when she had used an employee's "permanent" date as opposed to the original date of hire.  She testified:

A:    Well, that's just what I always go by, you know, as an HR person.  That's just what I usually go by, the permanent date, unless there's a reason to go by the probationary date....

Q.    Well, I mean, how do you decide?  Do you flip a coin?  Do you go to a policy manual?

A.    No.  I usually go by the permanent date, but – and of course, in this case, there were three people that had the same permanent date, so I thought the fairest thing to do would be to go down to the probationary date.

Q.    Give me some examples where you've always gone by the permanent date.

A.    I don't know.  I can't think of anything right now.

Q.    Well, you said you always do it, so give me some examples of that.

A.    Well, I don't know.  I'll try to think of something, but it doesn't come up that often, but it does come up sometimes.

Q.    Well, give me one example when you've done that.

A.    I don't know.  Can I think about it a minute?  I'll think of something though, because, you know, it doesn't come up a lot, but it does come up sometimes when we

11

have to know when their permanent dates are. (Harris depo. at 76-77).

Harris went on to testify that it was her practice to consider the date of hire to be the date of permanent employment, and that whenever she has a form to fill out that asks for the date of hire, she uses the permanent date "unless there's a reason to go to another -- ....". (Harris depo. at 79). However, Harris testified that even though she did not know the reason that the EEOC was asking for a list of employees to include their dates of hire, which means she would not have been aware of any reason to use a date other than the permanent date according to what she testified to was her practice, in the list she prepared for the EEOC, she listed the employees' dates of hire as their original dates of hire, not their permanent hire dates. (Harris depo. at 80-88). And, Harris testified that in manually preparing the chart for the EEOC, she got the information about the employees' dates of hire from the EBS (Electronic Billing System) forms in their files, which she gets from Metro HR downtown. (Harris depo. at 26-29, 39-43). While EBS forms are generated as different events occur in the tenure of an employee (Harris depo. at 48-49), none of the 70 different fields of information on an EBS form are to record an employee's permanent status date. (Harris depo. at 65; Harris depo. Exh. 9; Sinar depo. at 18-23; Sinar depo. Exh. 1). David Sinar, who is an HR Analyst III for defendant explained that the permanent status date is not recorded on the EBS data fields because there are no benefits based on that date.

12

(Sinar depo. at 23).

After this lawsuit was filed, however, Harris was asked to manually prepare another chart that included the employees' original dates of hire as well as their permanent status dates. (Harris depo. at 93-94; Harris depo. Exh. 14). This chart was prepared on October 10, 2012. (Harris depo. at 93). This date was two days before defendant's Answer to the Complaint was filed. (Doc. No. 6). Thus, as soon as litigation commenced and the validity of defendant's asserted reason for selecting plaintiff for layoff was challenged, defendant for the first time revised its original chart to have it include the permanent hire date.

There are other inconsistencies in Harris's explanation. She first testified that in the process of determining that plaintiff was the last hired, she only looked in the personnel files of Streeter, Stovall, and plaintiff because she "remembered" that they were the last three hired. (Harris depo. at pp. 61-62). However, she later testified that she looked in the personnel files of Teresa Barrett and Jon Felts in addition to Streeter, Stovall, and plaintiff. (Harris depo. at 71-72). She then testified that she did not look in Barrett's and Felts' files. (Harris depo. at 73). Harris testified that she looked at leave or vacation balance records she kept "to see which files to pull." (Harris depo. at 72-73). But Harris conceded that an employee's leave or vacation balance is determined by the continuous service date, or original date of hire, not the date of permanent

13

employment. (Harris depo. at 73-75). And, according to the leave balance records, Teresa Barrett would be shown to be the last person hired. (Harris depo. at 74). Harris testified that Dozier asked her who the last person hired was, and she conceded that she looked at the vacation balance records to confirm who the last person hired was, and that according to those records, Barrett was the last hired. (Harris depo. at 74-75). But according to Harris's explanation, seeing that Barrett was the last hired "joggled [her] memory" about Barrett and Felts "going permanent sooner." (Harris depo. at 75). While Harris testified that she kept the permanent date on the leave balance record (Harris depo. at 73), if that were true, she would have no reason to look further than the leave balance records to determine permanent hire dates, but she testified that she used the leave balance records "to determine which files to pull." (Harris depo. at 72).

Harris' explanation that she only looked in the personnel files of Streeter, Stovall, and plaintiff because she "remembered" that they were the last three hired (Harris depo. at pp. 61-62) is contradicted by Ken Sanders' testimony. Contrary to defendant's assertion that only Harris was involved in determining who the last person hired was (Defendant's Brief at pp. 15-16), Sanders, who at the time was the assistant director for the Fairgrounds (Sanders depo. at 5), testified that he too was involved in the process of trying to determine who the last person hired was. (Sanders

depo. at 10, 15).  And, contrary to Harris' explanation that she focused on Stovall, Streeter and plaintiff because they were the last maintenance workers to gain permanent employment status, Sanders testified that those three were the only maintenance workers considered because they were "looking at the day shift, particular duties with that shift … because that would be the shift that they were able, they thought, to reassign some duties and do without one person."  (Sanders depo. at 12).  Sanders testified that consideration of who to lay off was limited to the three day shift employees, and that Dozier and plaintiff's supervisor, David Lewis, made that decision.  (Sanders depo. at 18, 22-23).

Furthermore, regarding the use of an employee's permanent date, which is the date when an employee's probationary period ends, Harris testified that Ken Sanders is who told her about that practice.  (Harris depo. at 78).  Sanders was hired on July 28, 2008, and he testified that he learned of the "custom" of using the permanent status date from Howell Townes.  (Sanders depo. at 5-7, 24).  However, Townes testified that regarding employees hired in 2008, 2009, or 2010, he did not even know if Fairgrounds employees even served a probationary period.  (Townes depo. at 43).  Moreover, Sanders acknowledged that the permanent status date is not used to calculate vacations, benefits, or seniority, and that the significance or purpose of the permanent hire date is that it is when an employee is designated a permanent employee.  (Sanders depo. at 25).

**Harris as well conceded that an employee's benefits are calculated based on the continuous service date, which is the original hire date. (Harris depo. at 51).**

19.    Then, to break the "tie," Ms. Harris went back and compared the original "probationary" hire date for those employees.  Among those three, Larry Hunter had been hired last.  Harris Dec. at ¶ 9.

**RESPONSE:     Disputed.    Kenneth Sanders testified that the permanent status date is not used to calculate seniority.  (Sanders depo. at 24-25).**

**See Response to No. 18.**

20.    Ms. Harris did not consider the night and weekend shift workers – Teresa Barrett and J.D. Felts --as less senior that Mr. Hunter because their "permanent" hire date was before that of Larry Hunter, even though their initial hire date was after Mr. Hunter's.  Harris Dec. at ¶ 10.

**RESPONSE:     Disputed.    Kenneth Sanders testified that the permanent status date is not used to calculate seniority.  (Sanders depo. at 24-25).**

**See Response to No. 18.**

21.    Ms. Harris informed Director Dozier that Larry Hunter was the least

16

senior maintenance worker.  Harris Dec. at ¶ 12; Dozier Dec. at ¶ 9.

**RESPONSE:     Disputed.     Kenneth Sanders testified that the permanent status date is not used to calculate seniority.  (Sanders depo. at 24-25).**

**See Response to No. 18.**


22.     David Lewis had no input in the decision regarding who should be laid off, and he was not consulted to discuss the seniority of his subordinates before Mr. Hunter was laid off.  Lewis Dec. at ¶ 4.

**RESPONSE:     Disputed.  Sanders testified that consideration of who to lay off was limited to the three day shift employees, and that Dozier and plaintiff's supervisor, David Lewis, made that decision.   (Sanders depo. at 12-13, 17-18, 22-23).**

**Also, Dozier told Howell Townes that plaintiff had been picked to be laid off as opposed to the other four employees in the job classification because "he was lazy, he didn't do a lot of work."  (Townes depo. at 23-24). There was an open line of communication between Lewis and Dozier, Lewis kept Dozier informed of plaintiff's restrictions, Lewis was "frustrated" because he believed that plaintiff was "manipulating" his restrictions by getting them changed by his physician to get out of doing work, and Lewis shared his frustrations with Dozier.  (Dozier depo. at 8, 18; Lewis depo. at 26-33).  But Lewis could not explain how plaintiff might**

17

have been able to "manipulate" his restrictions, which were assigned by his physician, and he testified that he did not know how the restrictions kept changing, but he admitted that he was frustrated and "aggravated" by the changing restrictions because Lewis had to find something for plaintiff to do within the restrictions. (Lewis depo. at 26-33). Lewis even claimed that the physician's restriction of "no lifting over 10 pounds" was not a complete restriction of lifting 10 pounds from any height and was limited to a restriction of lifting 10 pounds beginning with the arm straight out. (Lewis depo. at 28-31; Lewis depo. Exh. 1).

Lewis had no basis to question plaintiff's veracity about his condition, however. (Lewis depo. at 34). Lewis made no record of any prior incidents involving plaintiff's restrictions of his attitude or his work ethic. (Lewis depo. at 35). Plaintiff's Declaration establishes that he did not in any way attempt to have his restrictions changed based on job assignments. (Hunter Declaration at ¶8). In fact, the record shows that the restrictions in effect when plaintiff was laid off were actually less limiting than previous restrictions. Plaintiff's restrictions following his March 22, 2011 physician visit were no lifting over 10 pounds and no pushing and/or pulling over 20 pounds of force, and no reaching above left shoulder. (Hunter Declaration, Exh. 4). Plaintiff's previous restrictions were no lifting over 5 pounds and no pushing and/or pulling over 10 pounds of force and no reaching above shoulders. (Hunter Declaration at

18

**¶6, Exh. 3).**

Moreover, the suspension letter from Dozier dated April 6, 2011 refers to "issues" that Lewis had with plaintiff's "handling of assigned duties." (Dozier depo. Exh. 1). Given that plaintiff was on temporary light duty as he recovered from his shoulder injury and evidence of Lewis' frustration and aggravation regarding plaintiff's physician-imposed restrictions on plaintiff's activities, the suspension letter's reference to "handling of assigned duties" can be seen by a reasonable juror as evidence that Dozier and Lewis viewed the need to accommodate plaintiff's disability in a negative light.

23.     Director Dozier did not go back and review the personnel files to make sure that Kristi Harris was correct in identifying Larry Hunter as the least senior maintenance worker. Instead, he relied on Ms. Harris in her capacity as HR Director. Dozier Dec. at ¶ 10.

**RESPONSE:** **Disputed. See Responses to Nos. 16, 17, 18 and 22. Also, contrary to defendant's assertion that only Harris was involved in determining who the last person hired was (Defendant's Brief at pp. 15-16), Sanders, who at the time was the Assistant Director for the Fairgrounds (Sanders depo. at 5), testified that he too was involved in the process of trying to determine who the last person hired was. (Sanders depo. at 10, 15).**

19

24.     In his EEOC Charge, Larry Hunter identified his hire date as June 26, 2009. EEOC Charge, attached to Motion as Exhibit E.

**RESPONSE:      Undisputed for purposes of pending motion that this was plaintiff's testimony.**

**However, the significance of the June 26, 2009 date for purposes of evaluating defendant's liability is disputed to the extent that defendant claims that plaintiff's testimony forecloses any dispute regarding the "date of hire" for layoff selection purposes, or whether defendant actually used a date of hire standard to select plaintiff for layoff. As shown in plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, the circumstantial evidence creates an inference that plaintiff was targeted for layoff for an impermissible reason, and that defendant's proffered reason for selecting plaintiff for layoff is pretextual. *See*, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at pp. 7-24. Specifically regarding plaintiff's date of hire, Defendant's EEOC Position Statement, which was submitted to the EEOC along with its Response to Request for Information, takes the position that the statement in plaintiff's EEOC Charge that he was hired on June 26, 2009 "is incorrect" and states that plaintiff "was hired by the employer on March 25, 2009." (Harris depo. Exh. 4).**

20

25.     June 26, 2009 is the date that Larry Hunter was designated a "permanent" Fairgrounds employee.  Harris Dec. at ¶ 8.

**RESPONSE:        Undisputed for purposes of pending motion.**

**However, the significance of the June 26, 2009 date for purposes of evaluating defendant's liability is disputed to the extent that defendant claims that plaintiff's testimony forecloses any dispute regarding the "date of hire" for layoff selection purposes, or whether defendant actually used a date of hire standard to select plaintiff for layoff.  As shown in plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, the circumstantial evidence creates an inference that plaintiff was targeted for layoff for an impermissible reason, and that defendant's proffered reason for selecting plaintiff for layoff is pretextual.   *See*, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at pp. 7-24.  Specifically regarding plaintiff's date of hire, Defendant's EEOC Position Statement, which was submitted to the EEOC along with its Response to Request for Information, takes the position that the statement in plaintiff's EEOC Charge that he was hired on June 26, 2009  "is incorrect" and states that plaintiff "was hired by the employer on March 25, 2009."  (Harris depo. Exh. 4).**


26.     Jerome Streeter and John Stovall were maintenance workers who were initially hired on March 16, 2009, which was nine days before Larry Hunter's initial

March 25, 2009 hire date.  Harris Dec. at ¶ 14.

      **RESPONSE:**      **Undisputed.**


27.     Teresa Barrett, the night shift maintenance worker, was initially hired on April 28, 2009 was made permanent on May 28, 2009.  Harris Dec. at ¶ 15.

      **RESPONSE:**      **Undisputed.**

28.     J.D. Felts, the weekend shift maintenance worker, was initially hired on April 13, 2009 was made permanent on May 28, 2009.  Harris Dec. at ¶ 16.

      **RESPONSE:**      **Undisputed.**


29.     According to Hunter's Interrogatory responses, his criminal convictions were as follows: aggravated assault, sale of cocaine, possession of a controlled substance, assault, robbery trespassing, domestic assault, and child abuse.  *See* Interrogatory response attached to Motion as Exhibit I.

      **RESPONSE:**      **Undisputed.**


30.     On his employment application, Hunter was asked the question, "Have you ever been convicted for violation of the law other than minor traffic offenses?" Hunter marked "yes," and on the portion asking him to explain further, he wrote, "Misdemeanor."  Application attached to Motion as Exhibit H.

      **RESPONSE:**      **Undisputed.**

22

31.     Director Dozier discovered that Hunter had not fully disclosed all of his criminal convictions on his employment application when Hunter responded to Interrogatories in this lawsuit on February 28, 2013.  Dozier Dec. at ¶ 11.

**RESPONSE:       Undisputed.**

32.     Throughout his history as a supervisor at the Fairgrounds, David Lewis has commonly had subordinates with on-the-job injuries who have had to be out on "light duty" assignment while they recovered.  Lewis Dec. at ¶ 5.

**RESPONSE:       Undisputed.**

32.  Mr. Lewis has never recommended that any of these employees be laid off or terminated.  Lewis Dec. at ¶ 6.

**RESPONSE:       Disputed.       Hunter was laid off and thereby terminated.**

33.     David Lewis considered night shift maintenance worker Teresa Barrett and weekend shift maintenance worker J.D. Felts to have fewer and less complicated job skills to master than did the first shift maintenance workers; thus, he made them permanent employees in less than 90 days.  Lewis Dec. at ¶ 7.

**RESPONSE:       Undisputed that Felts and Barrett were made permanent employees in less than 90 days.  However, overall, the job requirements for Felts and Barrett as Maintenance and Repair Workers I**

were the same as the day shift employees.  The evidence shows that the job description for day shift maintenance workers is the same as for the night shift or weekend shift workers.  (Lewis depo. at 17-18).  Also, both Streeter and plaintiff had previously been assigned to the nights shift, and Barrett, the nightshift worker, had at one point swapped shifts with another dayshift worker because of childcare issues.  (Lewis depo. at 14, 18-19).

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL DISPUTED FACTS

1.      "Hunter's restrictions appeared to sometimes change based on the task he was assigned.  For example, after being assigned to clean bathrooms, Hunter left work and then returned from the doctor's office with work restrictions that prohibited him for mopping."  (Defendant's Brief at p. 4, citing Lewis depo. at 25-27).  This fact is disputed.  While plaintiff was assigned a restriction of no mopping by his physician for a short period of time, plaintiff did not ask his physician to change his restrictions to avoid a work assignment. (Hunter Declaration, at ¶8; Hunter Declaration Exhibits 1-4).

       **RESPONSE:**

2.      In the April 6 meeting, "no one discussed [plaintiff's] alleged disability … and the weed eater incident was not brought up."  (Defendant's Brief at p. 6).

24

This fact is disputed by Dozier's testimony that when he met with plaintiff on April 6, plaintiff's position was that he physically could not handle the weedeating assignment and that it would harm his arm and that his position in the matter was in keeping with his restrictions. (Dozier depo. at 21). For his part, Lewis clearly disagreed with plaintiff's assessment of his injury and restrictions. (Dozier depo. at 23). In the meeting, Dozier said, "we're not going to have anybody around here not doing what they were told to do." (Hunter depo. at 44). This is a direct reference to plaintiff's disability and his request for a reasonable accommodation that would allow him to work within his physician's restrictions.

**RESPONSE:**



3. "Dozier decided to lay Hunter off before the end of the fiscal year on June 30 to save money on expenses." (Defendant's Brief at p. 7, citing Dozier Declaration at ¶16). This fact is disputed. Dozier testified that as a part of his alleged decision to lay plaintiff off before the end of the fiscal year, there was an effort to calculate how much money would be saved by an April 11 layoff, and that Howell Townes would have calculated such potential savings, (Dozier depo. at 42). However, Townes contradicted Dozier's testimony and testified that he did **not** perform this calculation. (Townes depo. at 27-30).

**RESPONSE:**

25

Respectfully submitted,

_Wade B. Cowan_
_____
Wade B. Cowan (S.C. #9403)
Suite 225
150 Second Avenue North
Nashville, Tennessee 37201
(615) 256-8125
wcowan@dhhrplc.com
Attorney for plaintiff

## CERTIFICATE OF SERVICE

I certify that on November 6, 2013, a copy of this document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

Keli J. Oliver
Derrick C. Smith
Assistant Metropolitan Attorneys
108 Metro Courthouse
P.O. Box 196300
Nashville, TN 37219
Attorneys for defendant

_Wade B. Cowan_
_____
Wade B. Cowan

26